UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

DARCY YONTS,     Plaintiff,

v.     Civil Action No. 3:11-cv-535-DJH

EASTON TECHNICAL PRODUCTS, INC.,     Defendant.

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Plaintiff Darcy Yonts injured his hand in an archery accident when an arrow he attempted to shoot broke in two upon release from his compound bow. Yonts alleges a myriad of product liability claims against the manufacturer of that arrow (the "Arrow"), Defendant Easton Technical Products, Inc. ("Easton").[1] After more than three years of discovery and a series of motions, just two primary causes of action remain: strict liability and negligence, both arising from allegedly inadequate warnings and instructions. Two others, a punitive damages claim and a subrogation claim by an intervening plaintiff, are merely derivative of the primary claims.[2]

Easton has moved for summary judgment on all remaining causes of action. (Docket Number 78-79). In considering the competing arguments, the Court must determine whether the submitted evidence supports an inadequate warning claim under Kentucky's law of negligence or strict liability. The Court concludes that Yonts has failed to present competent evidence to support his inadequate warning claims. Accordingly, the Court will grant Easton's motions and dismiss this case in its entirety.

---

[1] The parties agree that the Arrow is an Easton ST Excel 400 carbon shaft arrow manufactured by Easton.

[2] The Court previously dismissed all claims arising from any allegedly defective design or manufacture. (DN 84, at PageID # 1984-85). In the process, the Court mistakenly disposed of the "warnings" claims and the two derivative claims as well. *Id.* Those claims were subsequently reinstated. (DN 97, at PageID # 1962-63). Later, the Chief Judge reassigned this case to the undersigned. (DN 98).

I.      **Factual and Procedural Background**

In 2009, Yonts bought the Arrow from a friend named Dwayne Wells. The Arrow was used and had long been separated from its original packaging. Much of the Arrow's history is unclear—Wells himself may have actually bought it used from another person. In any event, Wells used the Arrow for hunting and target practice for roughly 18 months. After his purchase, Yonts also became familiar with the Arrow. He used it for target practice roughly three times per month for almost a year before the incident that led to this litigation.

Easton employs several methods to warn and instruct consumers on safe use of arrows. It sells arrows to stores in boxes with written instructions. Because some arrows are sold to customers individually and without written instructions, Easton permanently printed the following message directly on the arrows' carbon shaft: "SEE WARNINGS & USE at www.bsafe.ws or 877-INFO-ETP." The website and phone number provide warnings and instructions regarding the potential for injury from improper use of broken or damaged arrows. They also describe the proper method for inspecting and testing each arrow before each use.

The website contains a "Warnings and use" section that refers to "ARROW BREAKAGE." It provides:

> An arrow shaft can become damaged from impacts with hard objects or other arrows, or after being shot into a game animal. A damaged arrow could break upon release and injure you or a bystander. You must carefully inspect each arrow shaft, nock and other components before each shot to see that they have not been damaged. Before shooting, place the arrow between your thumb and fingers, and using your other hand to slowly rotate the shaft, run your fingertips along the entire arrow length, feeling and looking closely for nicks, cracks, splits, dents, or other marks that could indicate the shaft has been damaged. When checking carbon arrows, perform the following additional tests:
>
> 1. Grasp the shaft just above the point and below the nock, then flex the arrow in an arc (bending it away from you and others) with a deflection of 1 to 2 inches (2.5 to 5 cm), and listen for cracking noises. Perform this test four to six times, rotating the arrow slightly between each flex until you have gone

> around the entire arrow. If you hear or feel cracking, the carbon has been damaged.
>
> 2. While still holding the point and fletching ends, twist the shaft in both directions. If the arrow "relaxes" or twists easily, the carbon has been damaged.
>
> If an arrow has been damaged, or if you believe it has been damaged, do not shoot it again, as it could break on release, and sharp arrow pieces could hit and injure you or somebody nearby.

(DN 78-6, at PageID # 1228-29).

Yonts saw the text on the Arrow directing users to the website and phone number.[3] When asked in his deposition whether he had seen a warning, he responded "I have noticed that on the arrows." (DN 78-2, at PageID # 1202). When asked whether he saw that warning before the incident, he responded "I did. Because, like I said before, I regularly visually inspected my arrows for damage. So yes." (*Id.* at PageID # 1204). Though he saw the message on his arrows, Yonts did not visit the website or call the phone number. Without seeing those warnings or instructions, Yonts relied on his own regular "visual inspections" of the arrows and did not perform the recommended tests.

While shooting targets in August 2010 with his compound bow and carbon arrows, Yonts grabbed the Arrow. He may have visually inspected it but did not perform Easton's recommended tests (feeling, flexing, rotating, and twisting) to determine whether the Arrow was damaged. He loaded, aimed, and released. The Arrow's carbon shaft broke in two. The back

---

[3] Yonts's brief asserts that there is a genuine issue of material fact as to whether Plaintiff saw the warning on the arrow. This is flatly contradicted by testimony in Yonts's deposition, some of which is actually quoted in Yonts's brief. Without context, the brief declares that Yonts "continued . . . to explain that he would have seen what he referred to as the 'reference.'" (DN 87, at PageID # 1533). Even if this were true—and Yonts never said the word "reference" in his deposition—the brief fails to describe how this creates a factual dispute. The brief also says "Plaintiff does no [sic] acknowledge that the reference was either read by him or that the reference alerted him to the potential for serious injury and was understood to be a warning." (*Id.*). Yet Plaintiff acknowledged that he actually saw the "warning on the arrow before the incident" in the very section of the transcript cited in Plaintiff's response brief for the exact opposite proposition. (DN 66, 129:4-8, at PageID # 987).

3

half of the Arrow—the part with the fletching[4]—shot into the dorsal web space of Yonts's left hand. As a result, Yonts was injured, incurred significant medical bills, missed work, and initiated this lawsuit.

Through the testimony of his sole expert, Dr. Carol Pollack-Nelson, Yonts argues that Easton's arrows are unreasonably dangerous for sale because they contain an inadequate warning of their hazards. Easton replies that Dr. Pollack-Nelson's testimony is inadmissible under Federal Rule of Evidence 702 and is, in any event, irrelevant for a variety of reasons.

## II.     Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, a court views the evidence in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A court properly enters summary judgment where there is not sufficient evidence in support of the nonmovant's case upon which "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The moving party bears the initial burden of "informing the district court of the basis of its motion" and "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This initial burden may be satisfied by showing an absence of evidence to support an essential element of the nonmoving party's case for which the nonmoving party has the burden of proof. *Id.*

Once the moving party demonstrates this lack of evidence, the nonmoving party may only overcome summary judgment by showing that a genuine dispute exists, using specific facts

---

[4] The term "fletching" refers to the feathers on an arrow. WEBSTER'S THIRD NEW INT'L DICTIONARY 869 (1981).

that "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Where, as here, the nonmoving party bears the burden of proof at trial, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 223.

### III. Yonts Offers No Evidence to Support His Negligence and Strict Liability Claims

Yonts asserts both negligence and strict liability claims based on Easton's warnings and instructions. "[A]lthough the concepts of strict liability and negligence may overlap in some areas, an inadequate warning may give rise to separate and distinct causes of action under either theory of recovery." *Tipton v. Michelin Tire Co.*, 101 F.3d 1145, 1149 (6th Cir. 1996). A strict liability claim focuses on the condition of the product itself, whereas a negligence claim focuses on the conduct of the manufacturer or supplier. *Id.* Though this Court will analyze them separately, Kentucky courts often combine the two theories when deciding cases based on an inadequate warning. *See* RONALD W. EADES, KENTUCKY PRODUCTS LIABILITY LAW § 5:6 (2014-2015). A plaintiff is generally required to present expert testimony to support a claim under either theory, "unless of course the nature of the defect and resultant injuries are so obvious as to fall within the general knowledge of any ordinary person." *Honaker v. Innova, Inc.*, No. 1:04-CV-132, 2007 WL 1217744, at *2 (W.D. Ky. Apr. 23, 2007) (citation omitted); *see West v. KKI, LLC*, 300 S.W.3d 184, 197 (Ky. Ct. App. 2008). The alleged defect here is not so obvious. As such, the Court will analyze: (a) the admissibility of Yonts's proposed expert testimony, (b) Yonts's strict liability claim, and then (c) Yonts's negligence claim.

### A. Yonts's Expert Testimony Is Inadmissible under Rule 702

Defining the use and scope of expert testimony is critical to the resolution of this case, so the Court first examines the admissibility of Dr. Pollack-Nelson's testimony. Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

This rule imposes a gatekeeping responsibility on district courts to ensure that expert testimony is both relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). In addition to the four requirements enumerated in Rule 702, courts consider a list of non-exclusive factors to assess reliability, including: (1) whether the theory can be or has been tested; (2) whether the technique or theory has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the theory or technique's operation; and (4) the extent to which a known technique or theory has gained general acceptance within a relevant scientific community. *Daubert*, 509 U.S. at 594.

### 1. Dr. Pollack-Nelson Claims to Identify Four Problems with Easton's Warnings

Yonts proposes Dr. Pollack-Nelson as an expert in human factors psychology.[5] She has specialized in consumer product safety since 1982 and has been an independent human factors consultant since 1994. In this role, she analyzes the interactions between humans and products.

---

[5] "'Human factors' is a multidisciplinary study primarily devoted to the interaction between humans and their machines." 40 AM. JUR. *Trials* § 1 (2015). Experts in the field "study predictable human behavior in the interaction of human beings and a machine or a product, with an emphasis on how the object can be made more compatible with human capabilities." *Id.* § 2. They are commonly utilized in product liability cases. *Id.* § 1.

Though Dr. Pollack-Nelson is not an expert in arrow design or an engineer, she makes four criticisms of Easton's marketing of its arrows:

1. It is reasonable and foreseeable that a consumer will not notice the on-arrow "warning message" as it is entirely inconspicuous, particularly in contrast to other messages found on the Arrow.

2. Easton's website instructions were important but not adequate to effectively communicate the message to the user.

3. Easton should have made efforts to mitigate the arrow breakage hazard in the design of its arrows. Because Easton relies entirely on warnings and instructions to mitigate this hazard, it was imperative that Easton monitor and measure consumer awareness, understanding, and compliance with warning messages and make adjustments to the communication scheme, as necessary.

4. The content of the on-arrow message fails to adequately alert users to the hazard and draw them to the website. Mr. Yont's [sic] failure to pursue the warning referred to on the Arrow by going to the website or the toll-free number was reasonable and foreseeable.

(DN 53-1, at PageID # 574-88). Easton now argues that Dr. Pollack-Nelson's opinion testimony is inadmissible because it lacks a reliable scientific foundation and because it is irrelevant since Yonts admitted that he actually saw the warning on the Arrow.

### 2. Dr. Pollack-Nelson's Findings Do Not Satisfy Rule 702

The Court finds that the first two of Dr. Pollack-Nelson's criticisms are irrelevant to the facts of this case: (1) her assertion that the language on the Arrow's shaft was too difficult to see and (2) her assertion that the instructions on the website and on the toll-free number were inadequate. Yonts admits that, before the incident, he saw and read the warning on the Arrow directing him to the website or the toll-free number. He also admits that, despite reading this warning, he neither visited the website nor called the number. A different warning on the website or on the toll-free number would not have changed anything.

A third criticism falls well short of the reliability standard: Dr. Pollack-Nelson's conclusion that Easton should have mitigated the arrow breakage hazard in the design of its arrows. Dr. Pollack-Nelson has no education, training, or experience in arrow engineering or design. She admitted that she was unqualified to critique the design of Easton's arrows. Plus, after both sides identified experts in September, Yonts conceded his claims based on the Arrow's design *because he did not have the requisite expert testimony to support them*. Dr. Pollack-Nelson's design theory—and conclusion that Easton relied solely on its warnings to make a defective product safe—is unsupported, unreliable, and therefore inadmissible.

That leaves a fourth criticism: that the text on the Arrow failed to draw consumers to the website or toll-free number. However, Dr. Pollack-Nelson's suggested alternative—larger and bolder text with a pictogram—is not backed by any scientific or otherwise reliable evidence to support the conclusion that such a change would have convinced a user, such as Yonts, (who admittedly saw the actual warning) to also visit the website and follow its safety suggestions.

From this analysis, the Court must conclude that the totality of Dr. Pollack-Nelson's warning testimony is either irrelevant or does not meet the Rule 702 criteria for expertise and reliability of proposed expert testimony. The Court next finds that neither the strict liability nor the negligence claims can stand.

### B. The Strict Liability Claim Fails Without Expert Testimony

In any strict liability claim—whether from design, manufacture, or warning—the "sole question" is whether the product is "in a defective condition unreasonably dangerous to the user or consumer." *Montgomery Elevator Co. v. McCullough*, 676 S.W.2d 776, 780, 782 (Ky. 1984) (quoting Restatement (Second) of Torts § 402A). "In general, the character of warnings that accompany the product at the time of sale are an evidentiary consideration in deciding whether

8

the product is unreasonably unsafe." *Id.* (citing *Post v. Am. Cleaning Equip. Corp.*, 437 S.W.2d 516 (1968)). The ultimate "question is whether the product creates 'such a risk' of an accident of the general nature of the one in question 'that an ordinarily prudent company engaged in the manufacture' of such a product 'would not have put it on the market.'" *Id.* (quoting *Nichols v. Union Underwear Co., Inc.*, 602 S.W.2d 429, 433 (Ky. 1980)). Plaintiff bears the burden of establishing causation under the substantial factor test: "[W]as the defendant's conduct a substantial factor in bringing about plaintiff's harm?" *Morales v. Am. Honda Motor Co., Inc.*, 71 F.3d 531, 537 (6th Cir. 1995).

Yonts's strict liability claim fails because he offers no evidence to support his conclusion that the Arrow was "unreasonably" and "inherently dangerous." The warning on the arrows (that Yonts read) and instructions on the website (that Yonts declined to visit) are merely evidence to consider in determining whether the Arrow was unreasonably dangerous. Yonts says the warnings were inadequate, but he has no evidence of a dangerous condition that required a warning in the first place. A single break and the resulting injury, several years into the life of an arrow used by multiple unknown persons, is insufficient evidence that Easton's arrow was unreasonably dangerous. It is also insufficient to show that Easton should not have put the Arrow on the market without a substantially different or arguably stronger warning.

Moreover, Yonts offers no causation evidence. Two critical questions remain unanswered: What caused the arrow to break? What warning could have prevented Yonts's injury? Dr. Pollack-Nelson is by her own admission not qualified to answer, and Yonts has presented no other causation evidence. With no evidence explaining what caused the allegedly hazardous condition in the Arrow, Yonts could not possibly propose an alternative warning to

9

make the product safe. Instead, he only proposes warnings about an unstated, unknown, and unproven defect. That is not enough. The strict liability claim must be dismissed.

### C. Yonts Offers No Evidence of Negligence

In negligent warning cases, "Kentucky law imposes a general duty on manufacturers and suppliers to warn of dangers known to them but not known to persons whose use of the product can reasonably be anticipated." *Watters v. TSR, Inc.*, 904 F.2d 378, 381 (6th Cir. 1990) (citing *Post*, 437 S.W.2d at 516); *see also West*, 300 S.W.3d at 192. If a manufacturer has a duty to warn, the issues to be resolved are "whether an adequate warning was given and, if not, whether the failure to give it proximately caused the injury." *Post*, 437 S.W.2d at 522. A warning is adequate "to the end that the product user . . . shall have a fair and adequate notice of the possible consequences of his use or even misuse." *Id.* To establish causation, the plaintiff must establish that the defendant's failure to provide an adequate warning or instruction was a substantial factor in bringing about the plaintiff's harm. *Morales*, 71 F.3d at 537.

The problems with Yonts's negligence claim are similar to those that proved fatal to his strict liability claim: Yonts offers no evidence to prove duty or causation. As for Easton's duty to warn, it is undisputed that Easton knew that damaged arrows could break—it warned about that general hazard and gave instructions on how to prevent it. But what remains unclear is whether the Arrow was actually damaged at the time of the incident. If the Arrow broke due to some other defect, then a stronger warning would not have prevented Yonts's injury. So with no evidence of what caused the Arrow to break, Yonts cannot specifically define Easton's duty to warn as he must do.

What of Yonts's argument that Easton had a general duty to warn that arrows can break? Even if this were a proper description of Easton's duty, the claim would fail on the causation

element. Yonts's theory is not that Easton failed to warn him so that he could decide whether to purchase or use the Arrow; the theory is that Easton failed to adequately instruct Yonts to perform field tests to prevent breakage. But because Yonts offers no evidence, in the form of expert testimony or otherwise, to show what went wrong with the Arrow, a jury could only speculate as to whether any field tests could have prevented the break. In other words, no evidence suggests that Easton's warnings or instructions were a substantial factor in bringing about Yonts's harm. As such, the negligence claim must be dismissed as well.

### IV. The Related Claims Must Also Be Dismissed

Absent an underlying cause of action, any claim for punitive damages is baseless. This is because "a claim for punitive damages is not a separate cause of action, but a remedy potentially available for another cause of action." *Dalton v. Animas Corp.*, 913 F. Supp. 2d 370, 378 (W.D. Ky. 2012). Plaintiff's punitive damages claim is dismissed.

Likewise, Intervening Plaintiff North American Stainless's subrogation claim must be dismissed. "[W]ith contractual subrogation, the insurer's right is a right to reimbursement, strictly derivative, with no right to maintain the action independently so long as the insured is pursuing the claim." *Zurich Am. Ins. Co. v. Haile*, 882 S.W.2d 681, 684-85 (Ky. 1994). All of Yonts's claims have been dismissed; NAS therefore has no independent right to reimbursement.

Accordingly,

IT IS HEREBY ORDERED that Defendant's motions for summary judgment (DN 78 and DN 79) are SUSTAINED and Plaintiff's claims for failure to warn and punitive damages are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Defendant's motion for summary judgment (DN 80) on Intervening Plaintiff North American Stainless's claim is SUSTAINED and Intervening Plaintiff's subrogation claim is DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that this Memorandum Opinion and Order be entered WITHOUT SEAL.

This is a final and appealable order.

May 27, 2015

**David J. Hale, Judge**
**United States District Court**

cc: Counsel of Record